IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTONIO RIVERA, #352-432 | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-17-666 |
| WEXFORD HEALTH SOURCES, INC. | * | |
| PEGGY MAHLER, Nurse Practitioner[1] | | |
| RICHARD GRAHAM, JR., Warden | * | |
| DAYENA CORCORAN, Commissioner of Correction | * | |
| *All Defendants are Sued for Actions Under Color of Law in Their Individual and Official Capacities* | * | |
| | * | |
| Defendants | | |

**MEMORANDUM OPINION**

Antonio Rivera, a self-represented litigant incarcerated at the Western Correctional Institution in Cumberland, Maryland ("WCI"), filed a civil rights complaint under 42 U.S.C. § 1983, claiming that he has been denied proper medical treatment for a meniscus tear of the left knee first diagnosed in late 2016. ECF No. 1, pp. 1-2.[2] Rivera states that the Commissioner of Correction Dayena Corcoran and WCI Warden Richard Graham, Jr. failed to intervene after he complained that employees of the prison health care provider, Wexford Health Sources, Inc. ("Wexford"), including Nurse Practitioner Peggy Mahler, were ignoring his condition. *Id.*, pp. 3-6. He seeks money damages and declaratory relief. *Id.*, p. 19.

Defendants Graham and Corcoran (the "Correctional Defendants") and Defendants Wexford and Mahler (the "Medical Defendants") have filed motions to dismiss or, in the alternative, motions for summary judgment (ECF No. 9 and ECF No. 22), which are opposed by

---

[1] The Clerk shall amend the docket to reflect Defendant Mahler's proper title and the full and proper spelling of Defendant Corcoran and Defendant Graham's names.

[2] This opinion cites to pagination assigned by the court's electronic docketing system.

Rivera. ECF No. 16 and ECF No. 26. The Medical Defendants have filed a reply to Rivera's opposition (ECF No. 27), prompting Rivera's Surreply (ECF No. 28), which the Medical Defendants seek to strike. ECF No. 29. After review of the papers filed, the court finds a hearing on the pending matters unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For reasons outlined below, the motion filed by the Correctional Defendants will be granted. The motion filed by the Medical Defendants will be held in abeyance pending submission of a status report outlining additional medical services provided to Rivera subsequent to October, 2017.

**Standard of Review**

Because matters outside the pleadings are presented in Defendants' dispositive motions, they shall be considered motions for summary judgment. Fed. R. Civ. P. 12(d). Summary Judgment is governed by Fed. R. Civ. P. 56(a), which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw

2

all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Background**

The parties do not dispute that Rivera has ongoing problems with knee pain that existed prior to his transfer to WCI. In April 2015, he complained of recurrent knee pain and was referred for a new knee brace. ECF No. 9-4, p. 32. An x-ray ordered in May, 2015 showed no evidence of acute fracture, dislocation or subluxation, so knee conditioning exercises were ordered. *Id*., pp. 33-36. At times, Rivera was provided a knee brace, sleeve, crutches, and cane. *Id.*, pp. 32, 42. Because he suffers from elevated liver enzymes, his use of Tylenol for pain must remain below 4 grams. *Id.*, p. 38.

On April 25, 2016, Rivera was evaluated by WCI medical personnel following his transfer from Roxbury Correctional Institution (RCI). *Id.,* pp. 60-62. He requested a left knee brace. *Id*. An examination concerning his knee indicated no acute disease; nonetheless, an elastic knee brace was ordered, a Tylenol prescription was renewed, and a knee-conditioning sheet was given. *Id.* On May 4, 2016, Rivera was referred for physical therapy and his medication was changed. *Id.,* pp. 63-65. On June 16, 2016, he was continued on medication, advised to avoid running or jumping exercises, and was referred for evaluation for steroid injection. A knee exercise sheet outlining the exercises was provided so he could exercise on his own. *Id.,* pp. 66-67.

During August and September, 2016, Rivera was referred for knee injection, provided with a knee sleeve, and approved for physical therapy. *Id*., pp. 68-77. On September 15, 2016, he received a physical therapy evaluation with goals to increase quad strength and to establish a self-management program. *Id*., p. 78. Rivera was recertified for continued physical therapy sessions through December, 2016. *Id*., pp. 78- 101. On December 7, 2016, he admitted he was not doing his follow-up exercises. *Id*., p. 92.

The January 5, 2017, medical notes indicate Rivera had completed physical therapy for his knee on December 24, 2016, and was to continue to do exercises taught in physical therapy. *Id.,* p. 102. He declined another steroid injection. *Id*., p. 102-105. Rivera was advised that he should not stay on Tylenol #3[3] for a long period of time, and he should lose weight, refrain from jumping/running or exercise that would cause knee pain and follow up with a provider in one month for x-ray results and to see how he does on decreased Tylenol #3 dosing. *Id.,* p.102. Mahler wanted to wean him down from 2 po bid to 1 po bid prn of Tylenol #3. A left knee elastic brace and a knee x-ray were ordered. *Id*. On January 8, 2017, he refused a steroid injection. *Id.,* p.106. On January 9, 2017, an x-ray showed no evidence of an acute fracture, dislocation or subluxation, and no acute osseous abnormality. *Id*., p.122. On January 19, 2017, a smaller knee brace was provided. In February, 2017, a cane was approved and was provided on March 22, 2017. *Id*., pp. 109, 112-113.

On March 31, 2017, Rivera's medication was changed. *Id*. p.114. Dr. Roy Carls, an orthopedist, assessed Rivera as likely having medial and lateral meniscus tears, and possibly an anterior cruciate ligament tear. Dr. Carls recommended an MRI of the left knee to determine whether arthroscopic surgery was needed. The MRI consult was approved. ECF No. 22-4, p. 2;

---

[3] Tylenol #3 contains an opioid pain reliever (codeine) as well as a non-opioid pain reliever (acetaminophen). *See* https://www.webmd.com/drugs/2/drug-3179/tylenol-codeine-3-oral/details (last viewed December 6, 2017).

4

ECF No. 9-4, pp. 119, 124, 126-128. An MRI was scheduled at the Maryland Regional Medical Center on June 16, 2017, but did not occur, because the MRI machine was not available. ECF No. 9-4, p. 130.

A June 23, 2017, MRI indicated Rivera suffers from a horizontal oblique tear at the apex of the posterior horn of the medial meniscus, and a possible meniscal capsular separation. ECF No. 22-5, Affidavit of Ava Joubert, M.D., p. 10, ¶ 20. Although a follow-up with Dr. Carls was recommended, *id.*, the records do not reference that visit, or any additional medical treatment, including pain medications, that have occurred in the ensuing six months.

Rivera filed two administrative remedy procedure ("ARP") complaints while housed at WCI concerning his medical care. ECF No. 9-5, Records Declaration of L. Tennille Winters and attached records. On December 9, 2016, the acting assistant warden, not Warden Graham, responded to ARP WCI 2452-16, dismissing it after an investigation. *Id.*, p. 7. On January 17, 2017, Commissioner Corcoran dismissed headquarters' appeal ARP WCI 2452-16, where Rivera complained about the assistant warden's response. *Id.,* p. 3; Exhibit 5, Records Declaration of Kristina Donnelly and attached records. The investigation revealed that Rivera had failed to provide any additional evidence to substantiate his claim. *Id.* Rivera was advised to continue to work with medical regarding his medical care. *Id.*

On February 7, 2017, the acting assistant warden, not Warden Graham, dismissed ARP 0127-17 after an investigation. *Id.,* p.10. Rivera again complained about this medical care for his knee. *Id.* A search of the available records of the Headquarters Administrative Remedy Procedure Inmate Grievance Program database did not provide any record that the unit had received an ARP appeal for case number WCI-0127-17 from Rivera. ECF No. 9-6.

## Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003), citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences.... To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that

risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) quoting *Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000), citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Rivera cannot prevail as to his claims against the Correctional Defendants, who raise the affirmative defenses of sovereign immunity under the Eleventh Amendment and *respondeat superior* limiting their liability for medical care provided by an outside contractor.

The Eleventh Amendment bars suit in federal court against a state by its own citizens, absent consent or a valid Congressional abrogation of sovereign immunity. *See Coleman v. Court of Appeals of Maryland*, , 566 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Board of Trustees of Univ. of Alabama v. Garett*, 531 U.S. 356, 363 (2001); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States." (internal quotation marks and citation omitted)); *Pennhurst State School and Hospital v Halderman*, 465 U.S. 89, 100 (1984).

Under the Eleventh Amendment, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Therefore, official capacity claims are subject to sovereign immunity under the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 167 (1985); *accord Hafer v. Melo*, 502 U.S. 21, 25 (1991). As the Supreme Court explained in *Graham*, 473 U.S. at 165, "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.,* 436 U.S. 658, 690, n. 55 (1978)) (citations omitted); *see also*, *e.g.*, *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 532 (4th Cir. 2012) (treating suit against individuals in official capacity as suit against county). Therefore, states and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under 42 U.S.C. § 1983. *Will*, 491 U.S. at 71.

The State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts. *See* Md. Code, State Gov't. Art., § 12–201(a). But, it has not waived its immunity under the Eleventh Amendment to a suit of this kind in federal court.

There are several exceptions to the Eleventh Amendment bar. For example, the Eleventh Amendment does not prevent private individuals from bringing suit against State officials for prospective injunctive relief or declaratory relief for ongoing violations of federal law. *See, e.g., Equity In Athletics, Inc. v. Department of Education*, 639 F.3d 91, 107 n. 13 (4th Cir. 2011) (listing exceptions). The record, however, does not support any claim of ongoing unconstitutional conduct on the part of corrections personnel. Therefore, the Correctional Defendants are entitled to dismissal with regard to claims against them in their official capacities.

In Maryland, prisoner medical treatment is provided through a contractual arrangement with an outside vendor not part of State government. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000). The Correctional Defendants cannot be held liable for any alleged denial of medical care under the doctrine of *respondeat superior*, because they had no supervisory authority over the contractual health care providers. ECF No. 9-2, Richard J. Graham, Jr. Decl.; ECF No. 9-3, Dayena Corcoran Decl.; ECF No. 9-4, medical record. Further, while these Defendants did not personally respond to Rivera's ARP allegations, other corrections personnel did, and investigated whether medical treatment was occurring. ECF No. 9-5 (ARP responses).

Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001), citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994). Where, as here, the named Defendants had no supervisory authority over the individuals alleged to have caused the injury, it follows that they are not liable for such injury.

Rivera's Eighth Amendment claims against the Medical Defendants are not yet ready for resolution. It appears that Rivera has received diagnostic testing, medication, physical therapy, and assistive devices in response to his knee problem. What remains is a determination as to the next steps to be taken, including whether surgery will be required to correct the problem. The Medical Defendants will provide a status report outlining whether the additional consult with Dr. Carls has occurred, the outcome of that consult, and what additional care will be required for Rivera's chronic knee problem.

**Conclusion**

A separate order implementing the content of this Memorandum Opinion follows.

December 8, 2017 _____/s/_____
DEBORAH K. CHASANOW
United States District Judge